JUDGE OETKEN



12 CIV 2124

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

HFP CAPITAL MARKETS, LLC;
GEOFFREY BYRUCH,

                **Plaintiffs,**

          **v.**

PLASMA ARC TECHNOLOGIES, INC;
BARRINGTON SCHNEER; CHAD ALTIERI;
JOHN LEUFRAY; JAMES KOENIG;
CANADIAN STEEL, INC; CANADIAN
STEEL FABRICATORS, LTD.; GEORGE
MESA, JR.,

                **Defendants.**

No. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

RECEIVED MAR 22 2012 U.S.D.C. S.D. N.Y. CASHIERS

## INTRODUCTION

1.    This action involves a two-year ongoing scheme of fraudulent inducement, mail and wire fraud, and conversion. The Defendants fraudulently induced HFP into wiring roughly $2 million to defendants Plasma Arc Technologies, Inc. ("PAT") and Mr. Altieri by blatantly misrepresenting PAT's capabilities and experience in processing concentrated metal ("Ore Concentrates") into saleable precious metals. And once Defendants received HFP's money, they fraudulently converted it for an entirely separate joint venture that solely benefited the Defendants. HFP and Mr. Byruch ("Plaintiffs") discovered this fraud during a second round of diligence into Defendants in late-2011 and early 2012.

2.    *First*, PAT fraudulently induced HFP into transferring roughly $2 million to Defendant Altieri by blatantly misrepresenting PAT's executives and their backgrounds. PAT specifically represented to HFP in late-2009 that its CEO was Col. Don-Michael Bradford, Ph.D.

PAT even referred to Col. Bradford as the "brains of the operation." But Col. Bradford has confirmed that he never served as PAT's CEO, and never attended a PAT board meeting.

3.      Similarly, PAT misrepresented that its "Chief Engineer" for its project received a "Doctorate in Structural and Materials Engineering," when in fact he has admitted he has no such degree. Further, PAT fraudulently concealed that two of its executives, Defendants Schneer and Koenig, were permanently barred by the S.E.C. from the penny stock business for a similar fraud involving misuse of investor funds, which would have alerted Plaintiffs to important risks.

4.      *Second*, the Defendants defrauded HFP and converted its $2 million in wire transfers by misappropriating the money for use in a separate joint venture involving the Defendants and a third party.   In particular, from December 21, 2009 through November 29, 2010, HFP made and/or directed eleven wire transfers of $1,770,000 to PAT's Chad Altieri, for PAT's work for a company called MMM (in which HFP held a 20% interest).  But instead of using HFP's money for that purpose, PAT used that money for its own joint venture with Defendants Canadian Steel Fabricators, Ltd. and Canadian Steel, Inc. ("Canadian Steel").  These fraudulent acts are clear from PAT's own document, "Documentation of Equity Plasma Arc Technologies Metallurgic Recovery Project."  This document shows that HFP's wire transfers have been converted by PAT and Canadian Steel for their use in a joint venture with WMP.

5.      Accordingly, HFP seeks damages at least in the amount of the $1,770,000 of wire transfers taken from it, as well as punitive damages aimed at the repetitive fraudulent nature of Defendants' conduct, and an accounting for the use and location of the wire transfers.

## JURISDICTION AND VENUE

6.      This court has jurisdiction over this action under 28 U.S.C. § 1332, because the parties to this action are citizens of difference states, and the amount in controversy is at least

$1,770,000, which exceeds the statutory minimum for diversity actions of $75,000.

7.       Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(a)(2), because a substantial part of the events or omissions giving rise to the claim occurred in New York City.  In particular, HFP made the eleven wire transfers that are the subject of this action from New York City.  Further, the Defendants solicited HFP's wire transfers through communications that were received by HFP at its offices in New York City.

8.       Each of the Defendants is subject to personal jurisdiction in New York through their purposeful availment of HFP's wires sent from New York, from their solicitation of funds from HFP and of investments in New York, and through related communications sent to HFP and/or its employees in connection with the wrongdoing herein in New York.

## PARTIES

9.       Plaintiff HFP Capital Markets, LLC ("HFP") is a New York limited liability corporation, with a principal place of business at 685 Fifth Avenue, New York, NY 1022.  HFP executed and/or directed the wire transfers that form the focus of this litigation.

10.      Plaintiff Geoffrey Byruch is the Chief Executive Officer of HFP, and oversaw the second-round of due diligence performed by HFP in late-2011 and early-2012 that revealed the Defendants' fraud and conversion.  Mr. Byruch currently resides in New Jersey.

11.      Defendant Plasma Arc Technologies, Inc. ("PAT") is a corporation registered with the Secretary of State in Florida, with its principal place of business at 201 South Biscayne Blvd., 28th Floor, Miami, FL 33131.  PAT lists its Registered Agent as Defendant Chad Altieri, at the same address.

12.      Defendant Barrington Schneer is an executive and board member of PAT.  Based on information and belief, Mr. Schneer currently resides in Miami, Florida.  Mr. Schneer also

serves on the board of directors of Defendant Canadian Steel, Inc.  As a PAT executive Mr. Schneer specifically directed the conduct at issue in this action.

13.    Defendant Chad Altieri is corporate counsel for PAT, and the person to whom HFP sent the wire transfers that form the focus of this action.  Mr. Altieri resides in Miami, Florida, with an office at PAT's principal offices at 201 South Biscayne Blvd., 28th Floor, Miami, FL 33131.  Mr. Altieri also serves on the board of directors of Defendant Canadian Steel, Inc.  Mr. Altieri was the direct recipient of the wire transfers at issue in this action, and directed their use for the Defendants' personal gain instead of for use to advance the MMM project.

14.    Defendant John Leufray served during the relevant times in this complaint as an as an Executive Vice President, Chief Information Officer and Chief Technical Officer of PAT. In a recent court pleading, Mr. Leufray has asserted that he resides at 7365 Sherman Hoyt Ave., Twentynine Palms, CA 92277.  Mr. Leufray provided fraudulent background information to HFP, as well as misleading project updates to HFP for the MMM project.

15.    Defendant James Koenig has served during the relevant times in this complaint as an executive of PAT.  In a recent court pleading, Mr. Koenig has asserted that he resides at 73185 Sun Valley Dr., Twentynine Palms, CA 92277.  Mr. Koenig provided misleading background information and project updates to HFP.    Defendants PAT, Schneer, Altieri, Leufray and Koenig together are referred to as the "PAT Defendants."

16.    Defendant Canadian Steel, Inc. is a corporation registered in Florida, which lists its principal place of business as 12540 NW South River Dr. Medley, Miami FL 33178. Canadian Steel, Inc. participated in a joint venture with Defendant PAT through which all Defendants have fraudulently misappropriated HFP's funds.  Canadian Steel, Inc. fraudulently

and improperly took at least $200,000 of funds wired by HFP for Canadian Steel's own account in a joint venture.

17.     Defendant Canadian Steel Fabricators, Ltd. is a corporation organized under Canadian Law, with business offices located at 201 South Biscayne Blvd., 28th Floor, Miami, FL 33131, the same office as PAT.  Canadian Steel Fabricators fraudulently and improperly took at least $200,000 of funds wired by HFP for Canadian Steel's own account in a joint venture.

18.     Defendant George Mesa, Jr. is a President, Registered Agent, and member of the board of directors of Defendant Canadian Steel, Inc.  Defendant Mesa is also the Chairman of Defendant Canadian Steel Fabricators, Ltd.   As President and board member of Canadian Steel, and Chairman of Canadian Steel Fabricators, Mr. Mesa specifically controlled and directed the actions of both Canadian Steel entities above, in fraudulently and improperly taking at least $200,000 of wire transfers from HFP and using it for Canadian Steel's own account in a joint venture.

## FACTUAL ALLEGATIONS

### A.  HFP Capital Markets, LLC's Involvement in the Gold Processing Business

19.     In Fall 2009, HFP served as investment banking advisor to a company called MMM, in a private placement of MMM securities to investors that raised $3 million of investments in exchange for bond-type securities called Notes in MMM.

20.     MMM is a company that was formed for the primary purpose of financing the collection of 500 tons of mining ore concentrate, and then financing the processing and refinement of ore concentrates into saleable precious metals, such as gold.

21.     Ore concentrate is the raw metal product, usually an amalgam of various metals at various concentration levels, recovered from metal mines.  If ore concentrate can be refined to

separate out any precious metals such as gold, silver or platinum, then it can produce a profit. The issue is that it is very difficult to separate out such precious metals into saleable form. MMM's business plan was to finance the processing of such ore concentrate into valuable, saleable precious metals using the newest technology available.

22.     As part of its advisory fee, HFP received a 20% interest in MMM.   Further, pursuant to its role as advisor and 20% owner, HFP was entrusted with handling and distributing the $ 3million proceeds from the MMM private placement.

23.     Pursuant to its role, HFP analyzed various companies that represented that they could process ore concentrate into saleable precious metals.  One of these companies was PAT.

### B. PAT Fraudulently Induces $1.8 Million of HFP Wire Transfers by Misrepresenting Its Expertise in Plasma Arc Technology Gold Processing

#### 1. Background of "Plasma Arc" Technology

24.     PAT fraudulently induced HFP into transferring $1.8 million by misrepresenting its executives' backgrounds, and PAT's ability to use "Plasma Arc" technology it calls "Plasmafication" to process ore concentrates into saleable precious metals.  PAT specifically represented its expertise in Plasma Arc technology to process ore concentrates into saleable precious metals, based on "an executive team of plasma and energy experts."  But the executive team PAT advertised either did not actually work for PAT or did not have the credentials PAT advertised.  Thus, PAT knew that it was unable to provide the technology it advertised when it made these representations.

25.     Plasma Arc technology is a process for converting organic matter into gas using very high temperatures, and then separating out atoms from various compounds.  Plasma Arc technology refers to Plasma gasification.  Plasma refers to a state of matter similar to gas in which a certain portion of the particles are ionized, such as through intense heating.

26.     The plasma gasification process uses an electric arc gasifier (a plasma torch) to create a high-temperature ionized gas, which breaks organic matter apart, primarily into gas. This is done in a controlled vessel called a plasma converter, which takes the form of either a furnace or a reactor.

27.     A plasma torch uses inert gases (steam) and metal electrodes (such as copper). During the process, relatively high voltage, high current electricity is passed between two electrodes, spaced apart, creating an electrical arc. Pressurized inert gas is ionized when passing through the arc creating plasma. The temperature of the plasma torch can be in the range 4000–25000°F (2204–13871°C). At these temperatures molecular bonds break down into basic elemental components in a gaseous form, and complex are separated into individual atoms. Once compounds are separated into individual atoms, it can be scientifically possible to separate out valuable compounds from waste.

28.     The main use of Plasma Arc technology has been for waste treatment, by using the process to separate out toxic materials from harmless waste that is converted into carbon dioxide.   The technology allows full decomposition and disintegration of waste compounds.

29.     Given the highly technical scientific nature of Plasma Arc gasification technology, its successful application requires experts in science and engineering with specific training and experience in the area to apply the technology correctly.

30.     This was particularly the case for applying Plasma Arc technology to process ore concentrate into saleable precious metals.   As of 2009, Plasma Arc technology had not been widely used to process ore concentrate into saleable precious metals.   Although precious metals have been byproducts of Plasma Arc processing in waste and other areas, Plasma Arc technology had not frequently been employed to process saleable precious metals.

31.     Thus, PAT's specific and repeated misrepresentations of its expertise in Plasma Arc technology and ability to produce equipment and provide Plasma Arc processing of ore concentrates into saleable precious metals were crucial to HFP's decision to transfer $1.8 million to fund PAT's production of equipment and provision of gold processing for the MMM project.

**2.  Defendants Misrepresent PAT's Executive Team, Experience, and Ability to Provide Plasma Arc Technology Gold Processing**

32.     During discussions with HFP and MMM in Fall 2009, PAT repeatedly misrepresented itself to be expert in the use of Plasma Arc technology of using high-temperature torches to melt ore concentrates and separate out saleable precious metals.  HFP's diligence on PAT in August and September 2011 has revealed the following misrepresentations inducing HFP's wire transfers.

33.     *First*, a "Plasma Arc Technologies Executive Summary" provided by PAT's Messrs. Schneer, Altieri, Koenig and Leufray to HFP in early-October 2009, PAT boasted of "an executive team of plasma and energy experts."  But in fact, PAT had no scientific plasma and energy experts on its executive team.

34.     Similarly, the October 2009 "Plasma Arc Technologies Executive Summary" listed PAT's "Market Sectors" as including "precious...metals."  It stated that "The recovery of *precious metals* (gold, platinum, palladium, silver, etc.) yields a readily demanded good for sale through commodities markets." (emphasis in original).

35.     In addition, the PAT Executive Summary also represented that "**Precious metals are recovered daily from the plasma arc conversion process.  These metals/elements consist of gold, platinum, palladium, silver, copper and cadmium.  International commodity markets provide a readily identifiable market value and mechanism to sell precious metal ingots to numerous international purchases.**"

36.     PAT's representations about its prior processing of precious metals were false and misleading when made, because at that point PAT had never processed ore concentrate into saleable precious metals on any scale.  Indeed, PAT still has not done so as of the time of this Complaint.  PAT specifically misrepresented its ability to process ore concentrate into saleable gold and precious metals.  PAT's statements specifically represented "identifiable market value" for "readily demanded good[s] for sale" from its Plasma Arc technology processing, when in fact it had never produced any substantial amount of readily demanded precious metals of any identifiable market value at the time it made those statements.

37.     *Second*, even more blatant than its misrepresentations about its ability to process precious metals were PAT's blatant misrepresentations about its executives and expertise.  In particular, PAT made the following misrepresentations about Col. Bradford being PAT's CEO when in fact he was not:

   a.  PAT stated that "Col. Don-Michael Bradford, Ph.D, USAF-Ret., DAV, serves the company as its CEO and is a Service-Disabled Veteran.  He is also a management and business adviser to United States and Japanese architecture, environmental and engineering firms throughout Asia and the Pacific.   Following his career as a U.S. Air Force Officer, Col. Bradford became Vice President and Managing Director for Raytheon Asia Pacific Environmental Technologies (APET)." (emphasis added).

   b.  Defendants PAT, and Messrs. Altieri, Schneer, Koenig and Leufray on multiple occasions in 2010 and 2011 repeated the representation that Col. Bradford was their top executive.  Indeed, during an August 25, 2011 due diligence trip by HFP to a PAT facility in 29 Palms California – attended by Defendants Schneer, Leufray and Koenig – Defendant Schneer told Mr. Byruch and other HFP employees that Col. Bradford was "the brains of the operation."

   c.  The PAT Defendants also provided HFP with resumes for Col. Bradford, which similarly misrepresented that Col. Bradford worked for PAT.

   d.  The PAT Defendants also misrepresented on their website from 2009-2011 that various Plasma Arc waste processing projects involving Col. Bradford's separate entities were projects run by PAT.

38.     The PAT Defendants' representations that Col. Bradford served as PAT's Chief Executive Officer ("CEO") were blatantly false.  In fact, HFP has since contacted Col. Bradford, who confirmed that he had never served as PAT's CEO.  He also confirmed that he never attended any PAT board meeting.

39.     Col. Bradford told HFP that he had been introduced to Defendant Schneer by mutual lawyer friends, and had discussed with Defendant Schneer various plasma plants Bradford had designed.  After that, PAT began misusing his name on PAT marketing materials. Col. Bradford informed HFP employees that his understanding was that PAT never designed their own plasma arc system.  Further, he noted that he had contacted the Florida Secretary of State to have PAT remove all reference to him in PAT's advertising materials.

40.     The PAT Defendants' misrepresentation of its top two executive officers were material regarding its ability to perform the gold processing services represented to HFP.  A company's leadership is significant to its ability to perform the services it represents

41.     *Third*, the PAT Defendants misrepresented the background of its alleged "Chief Engineer."   PAT's "Executive Summary" stated that "Dr. Mark Shuey serves the Company as its Chief Engineer....Dr. Shuey has a...Doctorate in Structural and Materials Engineering." Further, PAT provided HFP with a resume for Shuey stating that he had received a "Doctorate in Science: Structural and Materials Engineering, (2005) Magna Cum Laude, Distinction in Cold-Formed Steel Design."

42.     In fact, Mr. Shuey never received a Doctorate, Ph.D. or any degree warranting calling him a "Doctor."  Mr. Shuey confirmed this fact only in early-September 2011, well after HFP had provided over $1.8 million for PAT.  This misrepresentation was material, because the

expertise and qualifications of PAT's Chief Engineer supervising the alleged "gold processing" was significant to HFP's decision to provide funds to PAT.

43.     In addition, the PAT "Executive Summary" advertised that "Barry Schneer serves on the Board of Directors for the company and provides business consulting and development advisement.  It also touted Mr. Schneer's "experience in business transactions…management and corporate structures" as well as "transactional knowledge and expertise to key business development platforms."

44.     These representations abut Mr. Schneer's experience in business transactions and business development were materially incomplete and misleading, however, because they omitted that Mr. Schneer had been the subject of an S.E.C. judgment and injunction permanently barring him from the participating in any offering of a penny-stock business after S.E.C. filed a complaint alleging fraudulent misrepresentations involving the offering, advertising and running of a company called GetAnswers, Inc.  *See* S.E.C. Litigation Release No. 19679 (May 1, 2006).  Importantly, the S.E.C. accused Mr. Schneer of "participat[ing] in the diversion of investor money to fund business projects such as an offshore internet bank and a multimedia center," as well as numerous misrepresentations in marketing and offering materials     S.E.C. Litigation Release No. 18955 (Nov. 2, 2004).

45.     Making allegations hauntingly similar to the Defendants' conduct in this case, the S.E.C. alleged that Mr. Schneer "participated in the diversion of investor money to fund business projects such as an offshore internet bank and the multimedia center.  Schneer purchased movie memorabilia with investor's funds from e-bay.com.  Schneer also used a luxury vehicle…which was paid for with GetAnswers' investor funds.  Schneer knew these uses of investor funds were not listed in GetAnswers' PPM's business plans, on the company's website or in sales

representatives' statements to investors." (*S.E.C. v. Schneer*, No. 04-cv-22743 (S.D. Fla., filed Oct. 29, 2004).

46.    Again, alleging very similar tactics to those involved here, the S.E.C. also alleged that Schneer misrepresented "the experience of GetAnswers' president and chief executive officers in starting successful Internet companies" and "GetAnswers' affiliation with a college." (*Id.* ¶ 1.)  The S.E.C. imposed a permanent bar on Mr. Schneer, as well as tens of thousands of dollars of disgorgement and civil penalties, on April 24, 2006.

47.    The PAT Defendants also fraudulently concealed that PAT Executive and Defendant James Koenig was also subject to a final judgment barring him participating in any offering of a penny stock, ordering him to pay $41,538.40 in disgorgement, and a civil money penalty of $120,000, as the C.E.O. of GetAnswers.  S.E.C. Rel. No. 20032 (March 7, 2007).  The S.E.C. allegations against Mr. Koenig involved a fraudulent offering of securities, misrepresentations of his business background, a misrepresented university alliance, misuse of investor proceeds on exorbitant salaries and "luxury automobiles," personal travel, "cash advances and expensive dinners." (Compl. ¶¶ 1, 16-24, *S.E.C. v. Get Answers, Inc., et al.*, No. 03-20048 (filed Jan. 15, 2003).)

48.    In addition, a background Scherzer Risk Management report commissioned by HFP into Mr. Schneer's background has revealed as substantial arrest record.  This included an arrest in 2000 for third- degree felony kidnap/false imprisonment, third-degree felony assault, and a moving traffic violation, as referenced from the Florida Department of Law Enforcement 2010 Arrest/Clerk Statute Table.   The Scherzer Report also referenced a September 10, 1986 *Miami Herald* article reporting that a Barry Schneer was one of five people arrested on charges of trafficking and conspiracy to traffic marijuana in a reverse sting operation by Miami Beach

police.  Had HFP known about this arrest record in advance, it would have had second thoughts about wire transfers to PAT.

49.     PAT's statements regarding its Mr. Schneer's and Mr. Koenig's background were thus materially incomplete as to be deceptive, because they omitted crucial information that would have warned HFP of the specific risks of misrepresented backgrounds and misuse of investor proceeds that are at issue in this action.

50.     *Finally*, PAT misrepresented the background of Defendant John Leufray.  PAT represented in its "Executive Summary" that Mr. Leufray "holds a degree in Industrial Design from University of Michigan."  But HFP has subsequently learned through a background report conducted by Scherzer Risk Management that the University of Michigan's service for reporting degrees indicated that Mr. Leufray attended the school from 1998-2003, but reported that no degrees were awarded.  A copy of Mr. Leufray's transcript was also requested, which also failed to verify any degree from the University of Michigan.  This misrepresentation is compounded by the fact that in other documents, Mr. Leufray claimed to be a "JD/MBA", including placing his signature above such a representation in one instance on April 1, 2010.  Thus, PAT's statements regarding Mr. Leufray's background were materially misleading.

### 3.  PAT, Canadian Steel, and their Executives Misappropriate at Least $1.8 Million of HFP Wire Transfers.

51.     Based on PAT's misrepresentation of its executive team, experience, and ability to apply Plasma Arc technology to process saleable precious metals, HFP directed the transfer of $1.8 million to Defendant Chad Altieri of PAT to fund a gold processing project for MMM, in which HFP had a 20% interest.  HFP transferred the funds to Mr. Altieri to fund an agreement for PAT to build two Plasma Arc machines capable of processing ore concentrates into saleable

gold and other precious metals, and for PAT to process numerous barrels of ore concentrates

owned by MMM through those machines to produce saleable precious metals.

52.     In particular, HFP initiated and/or authorized eleven transfers of money to

Defendant PAT through Defendant Altieri from December 21, 2009 through November 29,

2010:

| Date | Amount | From – Acct. | Recipient |
|------|--------|--------------|-----------|
| December 21, 2009 | $173,333.33 | HFP M&T Bank Acct. (on behalf of MMM) | Chad Altieri, Esq. LLC |
| February 1, 2010 | $173,333.33 | HFP M&T Bank Acct. | Chad Altieri, Esq. LLC |
| March 16, 2010 | $173,333.33 | HFP M&T Bank Acct. | Chad Altieri, Esq. LLC |
| April 6, 2010 | $100,000 | HFP M&T Bank Acct. | Chad Altieri, Esq. LLC |
| April 14, 2010 | $300,000 | HFP Wells Fargo Acct. for MMM | Chad Altieri, Esq. LLC |
| April 15, 2010 | $200,000 | HFP M&T Bank Acct. | Chad Altieri, Esq. LLC |
| April 30, 2010 | $200,000 | HFP M&T Bank Acct. | Chad Altieri, Esq. LLC |
| May 7, 2010 | $200,000 | HFP M&T Bank Acct. | Chad Altieri, Esq. LLC |
| May 18, 2010 | $100,000 | HFP M&T Bank Acct. | Chad Altieri, Esq. LLC |
| July 28, 2010 | $100,000 | HFP M&T Bank Acct. | Chad Altieri, Esq. LLC |
| November 29, 2010 | $50,000 | HFP Acct. for MMM | Chad Altieri, Esq. LLC |
| **Total** | **$1,770,000** | | |

53.     These wire transfers were provided to PAT and Mr. Altieri pursuant to an

agreement to provide equipment and processing to MMM.  And the wires were expressly made

pursuant to that agreement.

54.     But HFP's recent additional due diligence into PAT (upon installing a new

management team) has revealed that, instead, Defendants PAT and Canadian Steel, and their co-

Defendants, have misappropriated these funds for their own use.  In particular, PAT and

Canadian Steel have used these precise wire transfers as their own assets in a joint venture

between PAT, Canadian Steel, and Worldwide Mining Partners ("WMP").

55.     Defendants' fraudulent conversion of HFP's wire transfer is confirmed by a

document they created entitled "Worldwide Mining Partners & Plasma Arc

Technologies….Documentation of Equity," revised as of June 25, 2010, which lists the "Parties" "Worldwide Mining Partners," "Plasma Arc Technologies," and "Canadian Steel Fabricators." This joint venture is entirely separate from MMM, and in fact appears to compete with MMM in the gold processing business.

56.    Strikingly, this document reflects that the "Equity Invested to Date" in the joint venture includes *nine of the eleven* HFP wire transfers above – and all of the transfers made as of the date of this document. In particular, Exhibit I of the document lists "Escrow Deposit Verification" for the joint venture consisting of $900,000 of the wire transfers mentioned above, including:

   a.  An April 14, 2010 $300,000 payment from a Wells Fargo HFP bank account, with the wire being executed by then-HFP Chief Operating Officer Jack Horner, to Mr. Altieri;

   b.  An April 15, 2010 wire payment of $200,000 from an HFP Account (as reflected by the New "York NY 1022" zip code for origination of the wire transfer), to Altieri & Associates;

   c.  An April 30, 2010 wire payment of $200,000 from HFP's M&T Bank account, which specifically states that it is made on "*B/O: Metals Milling & Mining, LLC*" (emphasis added).

   d.  A May 7, 2010 wire payment of $200,000 from HFP's M&T Account stating it is made on behalf of HFP.

57.    Exhibit V, also entitled "Escrow Deposit Verification, references five additional wire transfers from   HFP totaling $719,999.99 that were fraudulently misappropriated by the Defendants:

   a.  A December 21, 2009 wire payment of $173,333.33 from an HFP account at M&T, stating it is from "Hfp Capital Markets, Llc, New York, NY 100222";

   b.  A February 1, 2010 wire payment of $173,333.33 from an HFP account at M&T stating it is "*B/O Metal Milling & Mining Llc*" [sic] (emphasis added).

    c.   A March 16, 2010 transfer of $173,333.33 from HFP Capital "Markets LLC New York, NY 10022" to Mr. Altieri;

    d.   An April 6, 2010 transfer, which is redacted in the document, but corresponds directly to the $100,000 HFP Capital transfer referenced above.

    e.   A May 18, 2010 transfer of $100,000 from HFP's M&T account to Chad Altieri, Esq.  Notably, Exhibit III of the same document lists a $250,000 wire transfer from Canadian Steel Fabricators to Plasma Arc Technologies, Inc. on the same day, further indicating Canadian Steel's benefit from these proceeds.

58.    The "Worldwide Mining Partners & Plasma Arc Technologies....Documentation of Equity," revised as of June 25, 2010, conclusively shows that PAT and Canadian Steel fraudulently took HFP's wire proceeds and applied it to their separate joint venture with WMP, instead of using it for the MMM project.  It also reflects that the Defendants took these funds entrusted to them by HFP and converted the funds for their own use.

59.    Later communications from PAT to HFP reflect that the subsequent HFP transfers to PAT on July 28, 2010 and November 29, 2010 also were misappropriated by the Defendants for their separate joint venture.  For example, an August 19, 2010 email from PAT's Richard Cartagena to an HFP employee with an attachment labeled "MMM PAT Purchase Sales Contract Addendum.v3 081710.doc," stated that PAT had received three transfers of "$173,333.33" from HFP for the MMM contracts in January, February and March, and a May 2010 payment of "$100,000."  The email also notes an additional payment of $100,000 in July 2010.  These payment details were sent by Mr. Altieri of PAT to Mr. Cartagena, who forwarded this information to HFP.

60.    The first four payments PAT identified in the above email as being used for MMM directly correspond to four of the payments identified in the chart of HFP wire transfers above, and reflected as being misappropriated by Defendants for their joint venture in the "Worldwide Mining Partners & Plasma Arc Technologies....Documentation of Equity," revised

as of June 25, 2010.  Thus, this email reflects that Defendants gave the same treatment to the July 2010 $100,000 payment referenced in the email – which directly corresponds to the July 28, 2010 HFP transfer of $100,000 to PAT for the MMM project.   It also indicates that the same misappropriation occurred to the November 29, 2010 payment of $50,000 to PAT's Mr. Altieri.

61.     Throughout 2010 and 2011, PAT continued to misrepresent that HFP's payments were being used for the MMM project.  For example, a June 28, 2010, email from Chad Altieri to HFP's Thomas Mikolasko purported to amend an agreement between MMM and PAT for equipment building and gold processing, and provided for the additional $100,000 payment that HFP made on July 28, 2010.  This email confirms that the July 28, 2010 $100,000 was paid by HFP to PAT, that it was intended for the MMM project, and as noted above, Defendants misappropriated this payment for their own joint venture.

62.     Similarly, on March 1, 2011, Defendant Leufray sent HFP's Mr. Mikolasko an email entitled "29 Palms Project Timeline & System Operational Procedures," which indicated that PAT was continuing work on the MMM project.  Indeed, Defendant Leufray used this email to ask HFP for additional funding, stating that "Assuming funding occurs this week, we're looking at a May 1 start-up" for processing gold for MMM.

63.     The joint venture among Defendants PAT, Canadian Steel and WMP continued through most of 2011, at the very least.  During 2011, PAT and Canadian Steel continued their fraudulent conversion of HFP's funds by misrepresenting that those funds were assets of the joint venture, instead of HFP assets for the MMM project.  The Defendants did so by engaging in mail and bank fraud in seeking financing from Alliance Capital Corporation, in a written response to a January 7, 2011 information request from Alliance Capital Corporation's Ben K. VanKorn, signed by Defendant Schneer.  In particular, PAT and Mr. Schneer represented that equipment

17

built and/or purchased with HFP funds for the MMM project were assets of PAT and the joint venture with Canadian Steel and WMP. Further, PAT and Mr. Schneer fraudulently misrepresented that ore concentrates called "Stryker Ore" were property of the Defendants' joint venture, when it was actually property of MMM – indeed MMM introduced PAT to Stryker.

64.    Defendants repeated this misrepresentation of HFP funds and MMM assets as property of Defendants' joint venture, in a February 10, 2011 email from Mr. Schneer to Alliance Capital Corp.'s Mr. VanKorn. The email contained a valuation summary and unit cost detail referring to funds and equipment provided through HFP.

65.    Defendants continued their fraud towards HFP regarding the MMM transaction by having PAT secretly execute an "exclusivity" agreement with its joint venture partner WMP that gave WMP exclusive use of PAT's equipment and processing capabilities as of October 14, 2010. PAT, signed by Defendant Schneer, reaffirmed this agreement on April 18, 2011 to assist WMP in obtaining additional financing. This "exclusivity" agreement directly contradicts MMM's representations that PAT would be providing MMM equipment and processing, through an agreement existing prior to the WMP exclusive agreement.

66.    Defendants' scheme is ongoing, as they have continued to pursue the joint venture with WMP, and are continuing to misuse the HFP wire transfers for their own purposes in violation of the terms under which such funds were provided.

67.    In sum, Defendants have misled HFP at every step of the transaction process. They fraudulently induced HFP into transferring $1.8 million to PAT, using misrepresentations by each of the PAT Defendants above. Then, all of the Defendants, including Canadian Steel, fraudulently misappropriated the $1.8 million in proceeds for their own use in a separate joint venture among PAT, Canadian Steel (run by Defendant Mesa), and WMP. Finally, Defendants

continued to misrepresent to HFP in 2010 and 2011 that it was continuing to use proceeds received by HFP for the MMM project, when in fact by that time they were exclusively working for WMP.

68.     Not surprisingly, Defendants have utterly failed to create a successful Plasma Arc gold processing operation, after taking HFP's $1.8 million and other funds.  This is because Defendants never had the capability of doing so, and appear to have created a side joint venture that does not appear to serve any purpose than being a vehicle to misappropriate funds from HFP and other unsuspecting investors.

## FIRST CLAIM FOR RELIEF
### (Fraudulent Inducement – Against PAT, Schneer, Altieri, Leufray, Koenig)

69.     Paragraphs 1 through 68 are re-alleged and incorporated by reference as if fully set forth herein.

70.     As set forth above, Defendants PAT, Schneer, Altieri, Leufray, and Koenig made numerous false representations of fact regarding PAT's executive team, experience, and ability to use Plasma Arc technology to successfully process ore concentrates into saleable precious metals.

71.     Plaintiffs justifiably relied on Defendants' misrepresentations to their detriment, by being induced to make wire transfers of $1.8 million for a project for Metals, Milling and Mining, LLC ("MMM") in which HFP held a 20% interest, which Defendants misappropriated for their own purposes.  This caused HFP and Mr. Byruch of at least $1.8 million in their possession.

72.     Accordingly, Plaintiffs seek rescission of the wire transfers, return of the $1.8 million, and punitive damages due to the repeated nature of the PAT Defendants' misconduct.

## SECOND CLAIM FOR RELIEF

**(Fraud -- Against All Defendants)**

73.     Paragraphs 1 through 72 are re-alleged and incorporated by reference as if fully set forth herein.

74.     The Defendants repeatedly misrepresented to Plaintiffs that they were working on building equipment and Plasma Arc gold processing for a project for MMM and would use money wired by HFP for that purpose.

75.     Plaintiffs justifiably relied on those misrepresentations, and made wire transfers of $1.8 million to Defendant Chad Altieri of PAT for that purpose.  Defendants acted with knowledge that they did not intend to use those funds for the MMM project, and instead used it for their own joint venture with WMP.  Defendants fraudulently stole the $1.8 million of wire transfers for their own purposes.

76.     Accordingly, HFP has suffered damages of at least $1.8 million of funds from its possession.

## THIRD CLAIM FOR RELIEF
### (Conversion -- Against All Defendants)

77.     Paragraphs 1 through 76 are re-alleged and incorporated by reference as if fully set forth herein.

78.     The Defendants, intentionally and without authority, improperly exercised control over at least $1.8 million of wire transfers of funds from HFP's accounts, which interfered with HFP's right to possess these funds to use them to fund equipment purchases and gold processing for a project for MMM, in which HFP held a 20% interest.

79.     Defendants improperly exercised dominion over the $1.8 million in wire transfers by applying it to their joint venture entirely separate from the MMM project.  It was a joint venture between PAT, Canadian Steel, as run by Mr. Mesa, and Worldwide Mining Partners.

The improper dominion is reflected in the June 25, 2010 "Documentation of Equity Plasma Arc Technologies Metallurgic Recovery Project," for WMP, PAT, and Canadian Steel and Plasma Arc Technologies, Inc. document referred to above, and related documents.

80.    Plaintiff has been harmed by such conversion in an amount not less than $1.8 million.

**FOURTH CLAIM FOR RELIEF**
**(Conspiracy to Commit Fraud – Against Canadian Steel, Inc., Canadian Steel**
**Fabricators, Ltd. and George Mesa, Jr.)**

81.    Paragraphs 1 through 80 are re-alleged and incorporated by reference as if fully set forth herein.

82.    Defendants Canadian Steel, Inc., Canadian Steel Fabricators, Ltd. and George Mesa, Jr. engaged in conspiracy to defraud the Plaintiffs.  Each of these three defendants had a joint venture agreement with PAT, and WMP, through which they misappropriated $1.8 million of funds from HFP that was intended for use on a project for MMM.

83.    Further, these Defendants confirmed an agreement to defraud HFP by misappropriating HFP's funds for the joint venture between PAT, Canadian Steel and WMP.

84.    Canadian Steel and Mr. Mesa, the Director, President and Chairman of the Canadian Steel entities, took an overt act in furtherance of its conspiracy with PAT by participating in the joint venture that utilized funds provided by HFP that were intended for the MMM project.

85.    The two Canadian Steel entities and Mr. Mesa intentionally participated in furtherance of the scheme to defraud HFP through their receipt of periodic reports like the "Documentation of Equity Plasma Arc Technologies Metallurgic Recovery Project." That document identified Canadian Steel Fabricators as a party to the venture, and clearly stated that

the joint venture was being funded by transfers from HFP, including those clearly stating they were on behalf of "Metals, Milling and Mining," and indicated that Canadian Steel received HFP wire funds through the joint venture.   Further, their intentional participation and knowledge is also evident from the fact that PAT Defendants Messrs. Schneer and Altieri are members of the Canadian Steel, Inc. board of directors.

86.     Plaintiff has been damaged as a result of the conspiracy involving Canadian Steel, Inc., Canadian Steel Fabricators, Ltd., Mr. Mesa, and the PAT Defendants in the amount of at least $1.8 million of misappropriated funds.

<u>**FIFTH CLAIM FOR RELIEF**</u>
**(Conspiracy to Commit Conversion – Against Canadian Steel, Inc., Canadian Steel Fabricators, Ltd. and George Mesa, Jr.)**

87.     Paragraphs 1 through 86 are re-alleged and incorporated by reference as if fully set forth herein.

88.     Defendants Canadian Steel, Inc., Canadian Steel Fabricators, Ltd. and George Mesa, Jr. engaged in a conspiracy with the PAT Defendants to convert $1.8 million in wire transfers from the Plaintiffs.

89.     Each of these three defendants participated in a joint venture agreement with PAT and WMP, through which they misappropriated $1.8 million of funds from HFP that was intended for use on a project for MMM.

90.     Further, these Defendants confirmed an agreement to convert HFP's wire transfers by misappropriating HFP's funds for the joint venture between PAT, Canadian Steel and WMP.

91.     Canadian Steel and Mr. Mesa, the Director, President and Chairman of the Canadian Steel entities, took overt acts in furtherance of its conspiracy with PAT by participating

in the joint venture that utilized funds provided by HFP that were intended for the MMM project.

92.    The two Canadian Steel entities and Mr. Mesa intentionally participated in furtherance of the scheme to defraud HFP through their receipt of periodic reports like the "Documentation of Equity Plasma Arc Technologies Metallurgic Recovery Project," which identified Canadian Steel Fabricators as a party to the venture, and indicated that Canadian Steel and Mr. Mesa had received HFP funds through the joint venture, including those clearly stating they were on behalf of "Metals, Milling and Mining." Further, their intentional participation and knowledge is also evident from the fact that PAT Defendants Messrs. Schneer and Altieri are members of the Canadian Steel, Inc. board of directors.

93.    Plaintiff has been damaged as a result of the conspiracy involving Canadian Steel, Inc., Canadian Steel Fabricators, Ltd., and Mr. Mesa, and the PAT Defendants, in the amount of at least $1.8 million of lost funds.

## SIXTH CLAIM FOR RELIEF
### (An Accounting – Defendants Plasma Arc Technologies, Inc., Chad Altieri)

94.    Paragraphs 1 through 93 are re-alleged and incorporated by reference as if fully set forth herein.

95.    Plaintiffs made wire transfers of $1.8 million to PAT, and in particular Defendant Altieri in a fiduciary capacity, pursuant to PAT's relationship with HFP to perform the MMM project, and pursuant to Mr. Altieri's status as a lawyer charged with the responsibilities of holding funds in escrow for their intended purpose.

96.    PAT and Mr. Altieri have participated in misallocating and misappropriating HFP's $1.8 million in wire transfers entrusted to them pursuant to this fiduciary relationship.

97.    Accordingly, Plaintiffs seek an accounting of the use of these funds, and identification of the current status of the funds, for purposes of recovering them back from Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request a Final Judgment in their favor,

(a)    Awarding Plaintiffs compensatory and consequential damages in the amount of at least $1,770,000;

(b)    Awarding Plaintiffs punitive damages due to the repeated acts of fraud and wrongdoing in this action;

(c)    Ordering rescission of the $1,770,000 in wire transfers that Plaintiffs have made to the Defendants;

(d)    Awarding prejudgment interest, reasonable costs and expenses, including attorney's fees, incurred in prosecuting this action; and

(e)    Granting Plaintiffs such further relief as the Court deems just and proper.

Dated: March 21, 2012          By:
       New York, New York

Samuel J. Lieberman
Douglas R. Hirsch
SADIS & GOLDBERG LLP
551 Fifth Avenue, 21st Floor
New York, NY 10176
Tel:    (212) 573-8164
Fax:    (212) 573-8149

*Attorneys for Plaintiffs HFP Capital Markets, LLC
and Geoffrey Byruch*

24